**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

**MARKUS CARSON**

   **Plaintiff,**

**v.**

**AMERICAN EQUIPMENT COMPANY,
INC.**

   **Defendant.**

Civil Case No.
Judge:

**COMPLAINT**
and **JURY DEMAND**

## NATURE OF THE CASE

1.  This is an employment discrimination case alleging a racially-hostile work environment, retaliation, discriminatory discharge, and failure to hire, brought pursuant to 42 U.S.C. § 1981.

## PARTIES AND JURISDICTION

2.  From April 2017 to November 2018, Plaintiff Markus Carson ("Carson") was employed by Defendant American Equipment Company, Inc. ("AMECO"), a subsidiary of Fluor Corp. ("Fluor"), through Fluor's wholly owned staffing agency TRS Staffing Solutions ("TRS"). Carson is African American.

3.  As an employee of AMECO, through TRS, Carson had contractual relationships with AMECO and TRS within the meaning of § 1981.

4.  Defendant AMECO is a global supplier of vehicles, construction equipment, tools, support services, and asset management services across multiple industries and government agencies.

5.  AMECO is a wholly owned subsidiary of Fluor.

6.      According to its website, www.AMECO.com, AMECO employs "thousands" of employees around the world.

7.      AMECO is headquartered at 2106 Anderson Road, Greenville, South Carolina 29611.

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1343.

9.      Venue is proper in the District of South Carolina, Greenville Division, pursuant to the general venue provision statute, 28 U.S.C. § 1391, because the conduct complained of herein took place in Greenville, South Carolina.

**FACTUAL ALLEGATIONS**

*AMECO Warehouse*

10.      AMECO has over twenty locations worldwide and maintains its global headquarters in Greenville, South Carolina.

11.      The Greenville, South Carolina headquarters comprises an administrative office building and a warehouse (the "warehouse"), among other facilities.

12.      The warehouse is station to approximately twenty to twenty-five AMECO employee technicians and five to ten non-technician employees.

13.      The vast majority of the employees in the warehouse are Caucasian.

14.      Carson was one among only three African-American workers employed at the warehouse during the relevant time period.

15.      At all relevant times, the warehouse was an open-floor facility with offices on the perimeter.

16.      At all relevant times, Jerry Williams, Caucasian, was the manager of the warehouse.

17.     At all relevant times, Les Adams, Caucasian, was the supervisor of the warehouse technicians.

18.     As warehouse supervisor, Adams had the authority to administer disciplinary write-ups, distribute job assignments, and make recommendations as to hiring and firing.  Adams reported to Manager Jerry Williams.

19.     At all relevant times, Don Wooten, Caucasian, was a senior technician at the warehouse.

20.     Wooten, as a senior technician, had authority to distribute job assignments to junior warehouse technicians and to recommend promotions, hiring, and firing of non-senior warehouse technicians.

21.     Wooten influenced decisions related to the hiring and firing of warehouse technicians.

*AMECO and TRS as Joint Employers*

22.     TRS is a wholly owned subsidiary of AMECO's parent corporation, Fluor, and provides recruitment and staffing services to Fluor and its various subsidiary companies worldwide, including AMECO.

23.     Warehouse employees are hired either directly by AMECO or placed at AMECO through TRS.

24.     Warehouse technicians placed at AMECO through TRS work with the same equipment and tools as those technicians hired directly by AMECO.

25.     Warehouse technicians placed at AMECO through TRS are subjected to the same policies and procedures as technicians hired directly by AMECO.

26.    AMECO maintained significant control over the terms and conditions of those it jointly employed with TRS, including Carson.

27.    Warehouse technicians hired through TRS worked alongside warehouse technicians permanently employed at AMECO.

28.    Warehouse technicians, both those permanently employed at AMECO and those hired through TRS, reported to AMECO Supervisor Les Adams and AMECO Manager Jerry Williams.

29.    AMECO Supervisor Adams directed all warehouse technicians, including those staffed through TRS, like Carson, on all aspects of their job assignments, including what to do, how to do it, where to do it, how quickly to do it, and what materials to use.

30.    AMECO Supervisor Adams inspected the work and conducted performance reviews of warehouse technicians staffed through TRS, including Carson.

31.    Warehouse technicians staffed through TRS, including Carson, were required to clock in and out of the warehouse with AMECO Supervisor Les Adams.

32.    Warehouse technicians staffed through TRS, including Carson, were required to notify AMECO Supervisor Adams if they expected to be late or absent.

33.    During the relevant time period, AMECO Warehouse Manager Williams and AMECO Warehouse Supervisor Adams held a mandatory safety meeting, attended by all warehouse employees, including TRS workers, at the start of each work day.

*Racially Hostile Work Environment*

34.    AMECO fostered a racially hostile work environment by tolerating discrimination and racial harassment of African-American employees by management and production workers alike.

35.    The racial harassment occurred on a daily or near-daily basis in the form of racial slurs, derogatory jokes and language; and harassing conduct from supervisor and coworkers, because of race.

36.    AMECO had an ineffective anti-harassment policy during the relevant time period.

37.    Despite the prevalence of racist language and slurs in and around the warehouse during the relevant time period, which put all who were in and around the warehouse on notice that African Americans would be offended, AMECO management did not engage in any common-sense remedial measures.

38.    AMECO did not require all its warehouse employees to participate in anti-harassment training sessions, or complaint procedures in the event of harassment and/or discrimination.

39.    Racial harassment and hostility persisted throughout the duration of Carson's employment at AMECO.

40.    As described below, Carson and other employees complained of racial harassment and discrimination to supervisors, and other members of management.

41.    Beginning no later than April 2017, supervisors and managers ignored complaints of racial harassment and discrimination, and protected known racists from meaningful discipline, which allowed the racist culture at AMECO to persist well into 2018.

42.    At the time Carson started working at AMECO in April 2017, he was warned by fellow African American co-worker, Mr. Fisher, that personnel in the warehouse were "racist." Fisher told Carson, "Watch out for Don [Wooten]. You'll see."

43.    Soon after Carson began his employment at AMECO, his supervisor Les Adams expressly told him that he was hired to do "grunt work."

44.     Within days after Carson began working at AMECO, Carson witnessed a Hispanic co-worker employed in the maintenance department as a janitor ask Wooten if she could use a badge to get into the building where she was supposed to work, to which Wooten responded, "Why didn't you just jump the fence?"

45.     Soon after this incident, in late spring of 2017, Markus heard Wooten make a comment to the effect of, "if my daughter brought a black guy home then I'd kill both of them." Co-workers Woodring, and Dickson, African-American, witnessed this comment.

46.     On another occasion soon after Carson began working at AMECO, Wooten stated that he "felt sorry for grandparents walking around with mixed babies."

47.     Wooten used the slur "n*gger" regularly around the warehouse, including in the presence of Carson.

48.     For example, Wooten stated in the presence of Carson, in sum and substance, "Growin' up, n*ggers worked in the mills but they didn't stay in town."

49.     Wooten also made a comment to the effect of, "Colored women would come clean our house."

50.     Wooten would often make racially charged comments that likened all African Americans to gang members.

51.     Fisher also heard Wooten make frequent statements to the effect that African Americans were all gang members. For example, he would state, "I know you people got all kinds of guns," referring to African Americans, and "Black people be cappin' you."

52.    Fisher heard Wooten make comments like, "Why do black people wear their pants sagging?" and "did you get robbed?" when the employee (who is African-American) spoke about being in his neighborhood.

53.    On one occasion, Wooten was watching the news while at work in the warehouse, and after a story aired regarding a shooting at a local gas station, Wooten commented that the perpetrator must have been "black."

54.    In discussions while on lunch break regarding basketball, Wooten stated that he would not watch a basketball game if all starting players were African-American.

55.    Wooten also regularly directed comments loaded with racist stereotypes at Carson. For example, he asked Carson on more than one occasion, "What you bring for lunch, fried chicken and watermelon?"

56.    In the warehouse, employees had a CD player/boom box.

57.    Wooten played a CD with a song by David Allan Coe, called "If That Ain't Country," out loud on speakers in the warehouse in the presence of Carson. The song contained numerous instances of the slur "n*gger," and at each instance, Wooten would raise the volume and laugh.

58.    Wooten played the song multiple times, laughing and singing out loud with the recording, in the presence of Carson, other employees, and Carson's supervisor Les Adams.

59.    Carson captured video footage of Wooten playing this song. *See* https://www.youtube.com/watch?v=n6GR7mttxQM.

60.    Wooten's racist comments targeted Hispanic people as well. For example, when a co-worker, Mr. Warren, was dating a woman of Hispanic origin, Wooten made a comment to the effect of, "You got a Julio girlfriend." Carson was present for this incident.

61.    On another occasion, Carson overheard Wooten state in sum and substance, "Three thousand Julios are trying to get into my country."  Co-workers Calvin Dickson, Tyler Woodring, and David Peck witnessed this remark.

62.    Wooten was not ignorant of the fact that his comments were racist.  Other co-workers complained to Wooten, in front of Carson, that Wooten should refrain from making such racist statements.

63.    In fact, Wooten admitted to Carson and others that he grew up attending KKK meetings and rallies.

64.     Demonstrating his commitment to the cause of white supremacy, Wooten likened himself to a "head of the KKK" in the presence of Carson.

65.    Fisher also heard Wooten remark that he was one of the leaders of the KKK.

66.    Fisher was aware of Wooten making racist comments regularly,  and in the presence of Adams and Jones.

67.    Adams too made comments that reflected prejudice, and provide context for his refusal to react or end Wooten's racist comments. For instance, Fisher heard him remark, "Why would Zion Williamson's mama let him go to Duke," referring to an African American college basketball player, adding words to the effect of "Black people only want to be famous. They don't want education."

68.    Fisher asked Jones, "Is Les prejudiced?", explaining that Les Adams said "good morning" or "hello" to Fisher as he did to the Caucasian workers.

69.    In front of Adams and Jones, Wooten referred to Mexicans stating, "They need to build the wall. They need to quit coming over here."

70.     Nor did Fisher observe Adams or Jones (or any member of management) ever reprimand Wooten for his racist statements.

71.     At about the mid-point of Carson's employment, Wooten made one of his typical racist comments, which included slang about "the brothers robbing the store."

72.     Carson told Wooten his racist statements made him extremely angry, and that Wooten was taking a risk that Carson could lose his temper.

73.     Wooten replied, "that's when the Judge come see you."

74.     After work that day he said to Carson, "come here." He led Carson to his car parked on AMECO's lot.

75.     Wooten showed Carson an extremely lethal gun, called the Judge and said, "I'll get you with this, and I call it 'the Judge'; it's always in my car."

76.     The Judge is manufactured by Taurus International. It is a revolver which can chamber shotgun shells. In laypersons terms, it is a sawed-off shotgun that functions like a revolver:



77.     Workers are not permitted to maintain firearms in their personal vehicles parked at AMECO.

78.     On information and belief, Wooten brought the Judge to the workplace at AMECO, leaving it in his car while he worked.

79.     On information and belief, Les Adams, Carson's supervisor, was aware that Wooten brought the Judge to work.

80.     Coworkers were aware of Wooten's weapon.

81.     Wooten referred to the Judge regularly.

82.     Wooten's apparent pride in the work of the Ku Klux Klan, his admission to attendance at Klan "meetings," his flagrant and frequent use of racial slurs and stereotypes, and repeated playing of a virulently racist song at AMECO, which could be heard by Supervisor Adams, combined with Wooten's ability to kill Carson should he lose his temper, severely traumatized him.

83.     Since Wooten graphically demonstrated to Carson what would happen if he lost his temper in response to Wooten's racial abuse, Carson justifiably believed that if he made any complaint about Wooten's racist conduct, and Wooten learned of his complaint, his life would be in danger.

84.     Wooten's open endorsement of racial violence, likening himself to the head of the Klan, and threat to shoot Carson with what amounted to a sawed-off shotgun, had an impact on Carson not unlike the experience of watching men in white robes burn a cross in front of his home.

85.     The racism combined with the very immediate threat of being shot, had a severely negative impact on Carson's mood and anxiety levels.

86.     Carson began having nightmares about being shot by Wooten in his back as he ran from him.

87.     He woke up during or after these dreams extremely agitated.

88.     His partner would have to wrap her arms around him to help him calm his breathing.

89.     She began to recognize the symptoms of these nightmares while they were in bed.

90.     He grunted and moved in his sleep.

91.     When he awoke, he did not feel rested and he was in a bad mood.

92.     Carson developed insomnia.

93.     He began using over the counter sleep aids. As his symptoms worsened his frequency of use increased, to the point he felt he needed to use them daily, to sleep.

94.     His partner expressed her concern that he was overusing the OTC medication.

95.     On occasion, he would shut himself in the bathroom, because he was ashamed to cry in front of his partner.

96.     He fought with his partner more than in the past, leading to separations.

97.     When he woke, Carson would often begin doing pushups, to reassure himself that he was strong, and capable of self-defense.

98.     He increased the frequency of his visits to the gym and the intensity and duration of his workouts.

99.     Eventually he shared with his partner the full extent of the threat he faced at AMECO.

100.    On March 28, he and his partner visited the Emergency Room at AnMed Hospital because he was experiencing significant neck pain.

101.    Carson had not suffered any specific physical injury.

102.    He was prescribed Flexeril 10 mg three times a day for muscle spasm, resulting from muscle and tendon strain.

*Discriminatory Retaliation and Discharge*

103.    In or around early 2018, after a year on the job, Carson learned that Tyler Woodring, a Caucasian temporary employee who had been working at AMECO for only three months, was hired by AMECO as a permanent worker, despite Carson having greater qualifications.

104.    AMECO tried to keep the information about Woodring's hiring from Carson.

105.    Carson found out accidentally when Warren asked Woodring in front of Carson about the paperwork for the job.

106.    Woodring began at AMECO having recently graduated high school.

107.    Woodring did not have prior forklift experience – two years of which was required for the job, whereas Carson had over 10 years of forklift experience.

108.    In a meeting with supervisor Les Adams in early April 2018, Carson complained about the apparent racial disparity surrounding his job prospects and at the same time cited Wooten's racist comments as contributing to a racially hostile environment at AMECO.

109.    Adams reiterated to Carson that he was brought onto AMECO's staff to do "grunt work," and suggested that Tyler Woodring was not.

110.    During that meeting, Carson presented Adams with a letter that he wrote and intended to be directed to Human Resources, in which he complained of racism at AMECO:

April 4, 2018

To the Human Resources Department:

       I believe that I have been discriminated against by TRS and AMECO on the basis of my race (black). I was hired by TRS nearly a year ago, and I have demonstrated a strong job performance and work ethic during my time here. On multiple occasions in the past year, I have been told by my supervisor that I would be hired on by AMECO as a permanent employee, but months have passed with no such change taking place.

       Then recently I learned that Tyler, my white co-worker, who was just hired by TRS three months ago, has already been hired on by AMECO as a permanent employee. He has far less experience than me, and he has the same amount of education that I have. I believe that I have been treated differently than Tyler based on my race and have been discriminated against.

       In addition, shortly after I learned about Tyler's new status, I was told that I would have to sign a document that stated I had not been discriminated against on any illegal basis and had been treated fairly. However, I do not agree with that statement, as I believe that I HAVE been discriminated against. I cannot sign a document that I know to be untrue.

       I ask that you investigate my complaints. If these issues cannot be addressed, I will be forced to file a charge of discrimination with the EEOC. However, I am hopeful that we can resolve these issues without such a step.

       Please let me know if you need anything else from me. Of course, I will continue to perform all of my job duties to the best of my ability during this time. Thank you.

                         Markus Carson

111.    On seeing Carson's letter, Adams brought Carson into Manager Jerry Williams' office, and presented the letter to Williams.

112.    During the meeting, Williams asked Carson how he "found out" about Woodring being hired on in a permanent position.

113.    Carson asked if Williams could elevate the letter to Human Resources. However, Williams responded that directing such a letter to Human Resources would "do more harm" than good. Williams added that HR would not do anything about Carson's complaint.

114.    During the meeting, Williams did not inquire into Carson's complaints of discrimination.

115.    Williams did not offer to take a written statement from Carson and did not take notes of the meeting.

116.    Instead, Williams told Carson to "keep up the good work."

117.    Carson never received a call from Human Resources, or anyone else from management, regarding his written complaint.

118.    After handing his letter to both Adams and Williams, Carson was anxious and overwhelmed with stress.  He asked Williams if he could go home early.  Williams replied that Carson appeared tired and worn down, and therefore could go home.

119.    Carson was not paid for that day.

120.    On Carson's return to work the next day, he learned from other co-workers, including Wooten and  Dickson, that Williams had brought up his letter and complaint to the entire warehouse staff after Carson went home for the day, and joked that he would be "happy" to talk to Carson's lawyers.

121.    Fisher, who had been let go in February, allegedly for lack of work, despite that on information and belief AMECO hired another Caucasian worker as a diesel mechanic soon after, returned to AMECO in April 2018 to address some paperwork. He heard Jones say something to the effect that "Markus [Carson] is trying to sue for discrimination; go figure, that's not happening. Fluor is a big company – that's what we pay our lawyers for."

122.    In addition, Williams told the other employees that, as a temporary worker, Carson was a more expensive employee to AMECO management than other AMECO employees, and therefore, AMECO management could let Carson go easily.

123.    Carson understood Williams' remark to be a threat against him for his complaint—that were Carson to elevate his complaint to Human Resources, he would likely get fired.

124.    Prior to his submitting his letter complaint to Williams, Carson was asked to sign a document stating that he had not been subjected to discrimination at AMECO.

125.    Carson did not want to sign such a document because he felt that he was the target of discrimination and therefore did not sign such a document.

126.    The work environment became even more difficult for Carson after he submitted his letter complaint to Adams and Williams.

127.    For example, Supervisor Adams subjected Carson to a new and unreasonable standard approaching perfection with respect to Carson's inventory tasks.  Adams scrutinized Carson's work for any slight error.

128.    In addition, Adams would pile on more menial tasks for Carson to complete.

129.    Meanwhile, Wooten's racist remarks and conduct continued unabated.

130.    For instance, in the presence of Supervisor Adams and Manager Williams and other co-workers, Wooten stated in sum and substance, "Shoot the jumping beans at the border!"

131.    Adams laughed, but did not reprimand Wooten for his racist remark.

132.    Williams also did not say anything to Wooten in response to the racially offensive comment but later remarked, "Don will be Don."

133.    Management's lack of any meaningful, let alone *any*, response to Wooten's racism other than to laugh it off, sent a clear message to Carson and other employees: AMECO did not care about racial hostility in its warehouse.

134.    Although management repeatedly told Carson that he had the opportunity to be hired as a permanent employee for the positions that he was qualified to fill, Carson never saw that opportunity realized.

135.    Instead, management made him train other, less experienced Caucasian temporary employees for the positions for which Carson himself was qualified.

136.    For example, on management's request, shortly before a co-worker, Mr. Warren separated from AMECO in or around May 2018 to pursue other career opportunities, Carson assumed Warren's duties and discussed the prospect of permanent employment in Warren's position with Supervisor Adams and Manager Williams.

137.    However, even after Williams had told Carson that he was doing a good job at performing Warren's duties, Adams and Williams made Carson train a new Caucasian temporary employee to take on Warren's position.

138.    In or around September 2018, Carson inquired about his prospects for permanent employment, indicating to Adams and Williams that he had both the experience and the qualifications for permanent, full-time work.

139.    Despite Carson's experience and his willingness to take on greater responsibility as a permanent employee, in or around October 2018 AMECO management asked Carson to train a Caucasian temporary employee, David Moon, in Warren's former position.

140.    Moon did not have the same work experience or certifications that Carson had.

141.    On or about November 2, 2018, Adams informed Carson that he was being terminated, due to lack of work.

142.    AMECO management hired Moon, the Caucasian temporary employee whom Carson had trained to take on Warren's position permanently.

143.    Management did not compensate Carson for his training of Moon, or for his performance of additional job responsibilities in assuming Warren's position between May 2018 and November 2018.

144.    Carson's nightmares, sleep dysregulation, and other symptoms of severe emotional distress continued throughout his employment.

145.    To this day he has nightmares about his experiences at AMECO.

146.    As a result of AMECO's conduct, Plaintiff has suffered emotional distress and economic injury.

### COUNT I:

### HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981

147.    Plaintiff Carson incorporates by reference all prior paragraphs.

148.    AMECO subjected Plaintiff to a racially hostile work environment in violation of 42 U.S.C. § 1981.  AMECO's conduct constituted illegal discrimination based on race and illegal discrimination against Plaintiff in the terms and conditions of his employment.

149.    AMECO allowed the hostile environment to exist despite notice.

150.    As a direct, actual and proximate result of AMECO's race discrimination and racial harassment, Carson has suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation and loss of quality and enjoyment of life.

### COUNT II:

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

151.    Plaintiff Carson incorporates by reference all prior paragraphs.

17

152.    Carson engaged in protected activity, of which AMECO was aware.

153.    AMECO took materially adverse actions against Carson because of his protected activity, of which AMECO was aware, by *inter alia*, withholding permanent employment, assigning more menial work, exercising excessive scrutiny of Carson's day-to-day tasks, having Carson take on additional and greater responsibilities without granting a commensurate pay increase, refusing to hire him in a permanent position and discharging Carson in violation of 42 U.S.C. § 1981.

154.    As a consequence of AMECO's actions, Carson suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

155.    AMECO's actions proximately caused Carson's injuries.

## COUNT III:

### DISCRIMINATORY DISCHARGE
### IN VIOLATION OF 42 U.S.C. § 1981

156.    Plaintiff Carson incorporates by reference all prior paragraphs.

157.    Carson pleads this Count in addition to and in the alternative to Count II.

158.    AMECO discriminatorily discharged Carson due to Carson's race in violation of 42 U.S.C. § 1981.

159.    As a direct, actual and proximate result of AMECO's discriminatory discharge, Carson suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

## COUNT IV:

## FAILURE TO HIRE
## IN VIOLATION OF 42 U.S.C. § 1981

160.    Plaintiff Carson incorporates by reference all prior paragraphs.

161.    Carson pleads this Count in addition to and in the alternative to Count II.

162.    AMECO discriminatorily failed to hire Carson by withholding from him permanent employment because of his race and/or protected activity in violation of 42 U.S.C. § 1981.

163.    As a direct, actual and proximate result of the AMECO's failure to hire, Carson suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

1)    Enter a declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

2)    Enter an injunction and order permanently restraining the Defendant from engaging in such unlawful conduct;

3)    Order the Defendant to make Plaintiff whole with appropriate lost earnings, future lost earnings, compensation for loss of future pensions and benefits with pre-judgment and post-judgment interest as applicable;

4)    Order the Defendant to make Plaintiff whole by providing all compensation contemplated under the Civil Rights Act of 1866, 42 U.S.C. § 1981, for non-pecuniary losses including, without limitation, pain, suffering, inconvenience, frustration, loss of quality of life,

humiliation, loss of reputation and mental anguish in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable;

5)      Order the Defendant to pay Plaintiff punitive damages in amounts to be proved at trial with pre-judgment and post-judgment interest as applicable and in amounts sufficient to adequately punish the Defendant for engaging in this conduct and to prevent this conduct in the future;

6)      Order the Defendant to pay Plaintiff's reasonable attorney's fees, expert fees and all costs incurred in bringing and prosecuting this action with pre-judgment and post-judgment interest as applicable; and

7)      Enter an order providing all such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff herein requests a jury trial on all matters raised in this Complaint.


Dated: October 10, 2019
          Columbia, S.C.

                                        Respectfully submitted,

                                        Markus Carson


                                        By: s/ Bakari T. Sellers
                                              Bakari T. Sellers, Fed. Bar No. 11099
                                              Strom Law Firm
                                              2110 N. Beltline Boulevard
                                              Columbia, South Carolina 29204
                                              Phone: 803-252-4800
                                              Fax: 803-252-4801
                                              Bsellers@stromlaw.com

                                              *Local Counsel for Plaintiffs*

                                              Rebecca Houlding
                                              **FRIEDMAN & HOULDING, LLP.**
                                                  1050 Seven Oaks Lane

Mamaroneck, NY 10543
888-369-1119 x11
Fax: 866-731-5553
rebecca@friedmanhouldingllp.com
shilpa@friedmanhouldingllp.com
*Pro Hac Vice Admission Application To Be File*